# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# ROCK ISLAND DIVISION

| | |
|---|---|
| PAULINE McKINLEY DICK ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-4061 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| Administration ) | |
| ) | |
| Defendant. ) | |

## ORDER

This matter is now before the Court on Plaintiff Pauline McKinley Dick's Motion for Summary Judgment and the Defendant Commissioner's Motion for Summary Affirmance. For the reasons set forth below, Dick's Motion for Summary Judgment [#12] is GRANTED, and the Commissioner's Motion to Affirm [#14] is DENIED.

## Background

On December 19, 2003, Dick filed applications for both Disability Insurance Benefits ("DIB") and Social Security Income ("SSI"). Dick alleged disability as of December 6, 2003, due to seizure disorder, migraine headaches, and idiopathic hypersomnia. (R547). The agency denied her claim initially and on reconsideration. Dick requested a hearing, and on March 23, 2006, she appeared with counsel, and both she and Bob Hammond, a vocational expert, testified before Administrative Law Judge ("ALJ") E. James Gildea.

At this hearing, Dick explained that to combat her seizures, she had surgery in 2002, where a vagus nerve stimulator was installed, and, as a result, she has experienced no futher seizures. (R1131-R1132).[1]  In addition, Dick testified that she experienced severe sleepiness and that she had suffered from this affliction since the seizures started:

> [E]ver since the seizures started, I'd come home from work.  About an hour after I get home, I would fall asleep.  I would sleep for two or three hours.  I'd get up for a couple hours. I'd go back to bad.  I would do that all over again.  . . . So I started saying something to my sister because she said something, well, maybe you've got sleep apnea.  So I started checking into sleep studies and - - well, I did get one, my neurologist - - my old neurologist to do a sleep - - the first half of the sleep study which did come back normal and I couldn't get him to do the other half of the sleep study.  And I ended up getting my new neurologist [Dr. Rasmus] to do the second half of the sleep study and we found that I've got idiopathic hypersomnia which - - which is severe daytime sleepiness and I have taken several medicines that causes migraines which I live with them now or I have been living with them. (R1132-R1133).

On May 25, 2006, ALJ Gildea issued his written decision, denying Dick's disability application.  He stated that "[t]he severe impairments established by that record include a seizure disorder, migraine headaches, and idiopathic hypersomnia." (R547).  He further stated:

> At this time, the claimant's principal complaint is idiopathic hypersomnia. Complaining of diurnal sleepiness (the claimant reports sleeping up to 16 hours per day, in cycles that vary from day to day), the claimant had a sleep study performed, but there was no evidence that she suffered from sleep apnea.  Another sleep study did lead to a diagnosis of idiopathic hypersomnia by Dr. Rasmus.  His diagnosis was based on a Multiple Sleep Latency Test which established a mean latency period of 4.5 minutes (nine minutes at 8:30, I minute at 10:26, three minutes at 12:26, and four minutes at 14:25).  However, the technician noted that the Sleep

---

[1] Vagus nerve stimulation ("VNS") is designed to prevent seizures by sending regular, mild pulses of electrical energy to the brain via the vagus nerve. These pulses are supplied by a device something like a pacemaker. The VNS device is sometimes referred to as a "pacemaker for the brain." It is placed under the skin on the chest wall and a wire runs from it to the vagus nerve in the neck. http://www.epilepsy.com/epilepsy/vns

>Latency Test was performed using a standardized technique with the exception of not performing a second polysomnogram for comparison and without obtaining a sleep diary. (Exhibits B-23F, B-24F and B-25F/5). The technician also noted that there had been a polysomnogram performed on April 16, 2003, that was within normal limits, with an "excellent sleep efficiency" of 99% (Exhibit B-16F). (R548).

ALJ Gildea concluded that the evidence did not establish a disabling condition nor did the residual functional assessment completed by Dr. Rasmus in October, 2004. (R548).

ALJ Gildea continued:

>Thus, although the claimant has an underlying medically determinable impairment that could reasonably cause the symptoms alleged, the medical evidence does not support these symptoms to the degree alleged by the claimant. Further, the undersigned has evaluated the claimant's allegations and subjective complaints according to the guidelines set forth in Social Security Regulations 404.1529 and 416.929, as well as those contained in Social Security Ruling 96-7p. The claimant's statements concerning symptoms will not alone establish disability. Rather, the Administrative Law Judge must consider all the claimant's symptoms, including pain, and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, including statements or reports from the claimant, treating or examining physicians, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairment and any related symptoms affect the ability to work. (R548-R549).

Dick filed a Request for Review of Hearing Decision on June 6, 2006. (R600). On September 5, 2006, the Appeals Council, consisting of Ronald M. Rogers and Dorthea J. Lundelius, granted Dick's request for review under the substantial evidence provision of the Social Security Administration regulations (20 CFR 404.970 and 416.1470). (R559). The Appeals Council vacated the hearing decision and remanded the case to the ALJ and held that:

>The record is unclear regarding the severity of the claimant's migraine headaches and idiopathic hypersomnia. A sleep study conducted in February 2004 was consistent with severe daytime sleepiness (Exhibits B25F6). Records indicate that medication prescribed for the claimant's hypersomnia resulted in a marked increase in the claimant's migraines

3

(Exhibit B30F). Further evaluation is needed to determine the functional limitations imposed by these impairments. (R559).

On remand, the Appeals Council directed the ALJ to:

- Obtain evidence from a neurologist to clarify the nature, severity and functional limitations resulting from the claimants impairments (20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96-6p).
- Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20CFR 404.1529 and 416.929) and pertinent circuit case law and Social Security Ruling 96-7p.
- With benefit of expert testimony, give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 96-8p).
- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 85-15). The hypothetical questions should reflect the specific capacity/ limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p). (R560).

Upon remand, ALJ Gildea held a hearing on December 20, 2006, and Dick, Roland Manfredi, M.D., a medical expert, and George Paprocki, a vocational expert, gave testimony. (R1095-R1119). As the hearing began, ALJ Gildea stated:

For the record, this is a remand from the Appeals Council with specific directions that we should obtain the testimony of a medical expert specifically a neurologist concerning some of the symptoms and some of the medical records pertaining to the Claimant's claim and we have a doctor [Dr. Mandredi] available to do that. (R1097).

Dr. Manfredi testified after reviewing Dick's medical records, which he felt were fairly complete and gave him "pretty good information on her medical problems." (R1105). With regard to her allegation of sleep disturbance, Dr. Manfredi stated:

4

> More recently she suffered from sleep disturbance, sleep apnea and she was seen for this medically by a Dr. Rasmus in Davenport, Iowa. And she had an extensive workup for this problem and they did confirm that she had some changes on her medical examination and testing which revealed that she had the abnormality by the EEG testing that she had. And they continued to put her on various medications to try and improve the symptoms. They had some success but not complete success and to date she still has some difficulties with sleep disturbance during the daytime. And that brings us up to her record of April '[sic]05 where Dr. Steven Rasmus sent a letter describing her condition and her idiopathic hypersomnia with severe sleepiness. And she continues to have the problems, continues to be on medication and is otherwise in satisfactory condition. (R1105-R1106).

The examination continued:

> Q:    Doctor, could you explain in layman's terms what idiopathic hypersomnia is?
>
> A:    Well, it is a disturbance of brain function in which the patient is able to sleep overnight but during the daytime there is an impairment in which she tends to fall asleep during the daytime hours and this occurs beyond her control and can last up to a matter of minutes to hours during the daytime. She has shown that this is present in your medical record and she has made numerous visits and they have tried various medications to control this problem. But the one test that confirms this, she had an abnormal sleep latency test of 4.6 minutes and this is consistent with the daytime sleepiness. So it is a mental brain problem that impairs the patient from functioning normally and tends to put her to sleep at intervals during a normal day.
>
> Q:    Would you explain what [sic] is the term idiopathic means?
>
> A:    Idiopathic, we don't know the cause for this problem that she has, but it is shown to be present on some of the testing of her brain functions, she had an extensive workup by Neurology Consultants in Davenport, Iowa and they have continued to see her and support her problem and have been convincing evidence that this is present and continues to interfere with the patient's normal functioning.
>
> Q:    All right.
>
> A:    This has been noted to be present for at least since 2004 and maybe even earlier.
>
> Q:    In the - - in instances such as this, do you have an opinion as to what might be the ideology of this idiopathic hypersomnia?

A:    Not from reading her records.  There are some problems with psychological and psychiatric behavior that accompanies this difficulty in this patient, but that of itself is not the cause for the hypersomnia.  She did have the seizure disorder that we already described and that has apparently improved with this latest nerve stimulator that she has, but the hypersomnia problems that continue to date and it's shown in the medical record that this is present and they have tried various medication to treat it with only some success.

Q:    Okay.  In your experience, doctor, have you ever treated patients for hypersomnia of this nature?

A:    No.  This is a new syndrome that we are seeing and are becoming aware of and it is sort of something that is more present in the present literature on the neurological disorders, but it is a very rare and very unusual problem.  But today we have come to recognize it as a definite entity and must treat it accordingly.

Q:    Are there laboratory - - particular laboratory studies that would contain criteria that would lead to this diagnosis?  You said - - you mentioned the sleep latency studies.  But anything else besides that?

A:    No.  That's probably the most significant one.  There are no other blood tests or x-rays, CAT scans or MRIs that show abnormalities.

Q:    All right.

A:    But the EEG does show this particular stream of abnormal weight pattern that is seen on the brainwave test as we see in these patients.

Q:    And in terms of the latency, this was a - - I think there were studies done over a course of several days and there were different latency periods.  And I think this is the medium latency period.  Is that your understanding?

A:    Correct.

Q:    And that was - -

A:    4.6 minutes

Q:    Okay.  Do you have an opinion as to what would be considered a normal latency period?

A:    Well, there should not be any sleep latency on the EEG.  She did not have any REM times.  Those were not seen and a sleep diary was not

available be required. No. That is the only observation that they observed in her that was accompanying the sleep apnea disease process.

Q: Do you know whether when they conduct these studies there is normally a baseline that they work off of? I don't know if that's a clear term to you as - - in other words, what would be normal for that - -

A: Well, I'm afraid I'm not that well up on that - -

Q: Okay.

A: - - part of the problem. (R1106-R1109).

Dick's attorney then questioned Dr. Manfredi:

Q: …We have got the sleep study results. We have the diagnosis of the idiopathic hypersomnia and at her last hearing Ms. Dick testified that a couple times a day for maybe a couple of hours at a time she would just fall asleep. My question for you is [sic] is do you believe that her statement that that happens to her is consistent with what we do have in the record in terms of a diagnosis and what studies there are available?

A: Well, except for that one abnormal EEG finding, there really is no other test that will help us in this problem. It does occur with a patient where she becomes hypersomniac and sleeps during the day and there is evidence, I guess, to those around her that she has that. They have tried—

Q: I really can't hear.

A: - - various medications - -

Q: I can't hear.

A: - - including stimulants to try and correct this problem but not with too much success. (1109-1110).

On March 29, 2007, ALJ Gildea issued his written decision, denying Dick's

disability application. (R532-539A). He noted:

The Appeals Council remand order stated that the record was unclear regarding the severity of the claimant's migraine headaches and idiopathic hypersomnia. They found that the hearing decision did not address the listed factors for assessing symptoms and did not contain a function-by-function assessment of the claimant's ability to do work related activities. (R536).

7

The ALJ determined that the record established that Dick suffered from a seizure disorder, migraine headaches, and idiopathic hypersomnia. (R536).  The ALJ continued:

> It is well established that it is the claimant's responsibility to furnish convincing evidence of entitlement to benefits claimed.  Having carefully reviewed all the evidence of record, including the testimony, the Administrative Law Judge concludes that the claimant does not have an impairment or combination of impairments which meets or equals the requirements of severity established in the Listing of Impairments.  Her seizure disorder has been controlled by insertion of a vague nerve stimulator.  The episodic requirements listing 11.02 and 11.03 are not met, nor were they prior to the date when the stimulator was inserted. (May 2002).  Headaches per se are not included as a listing impairment.  Nor is there an established anatomical, physiological or psychological basis for attributing her headaches to a listed impairment.  There is no pulmonary basis for her hypersomnia established by the record, and therefore it has been described as idiopathic. (R536).
>
> The next step in the sequential disability evaluation is to determine the claimant's residual functional capacity, given the physical impairments detailed above.  Dr. Manfredi testified that he is credentialed in neurology, but admitted he has no experience in dealing with idiopathic hypersomnia.  Therefore, his conclusion was only that the claimant's symptoms could be associated with such a diagnosis.  The undersigned believes that this opinion does not substitute for the standard "degree of medical probability" that would provide a basis for finding the claimant disabled.  Dr. Manfredi's statements do not add anything to the weight of the evidence in this case.

Dick filed a request to review Judge Gildea's decision on April 5, 2007, arguing that the ALJ committed legal error by (1) concluding Dick's medical condition did not meet or equal a Listing; (2) commenting that Dick's statements were not fully supported by the medical evidence; (3) failing to make a finding regarding Dick's residual functional capacity relating to her idiopathic hypersomnia and the way that this condition would interfere with her ability to sustain full time competitive employment; and (4) concluding that Dick could return to her past work as a cashier based on a truncated RFC findings, which were not supported by the record. (R531; 1093).  On August 18, 2007, the Appeals Council found no reason to review the ALJ's decision. (R527-R530).

Having exhausted her administrative remedies, Dick timely filed her Complaint in this action on October 3, 2007. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g) 1383(c)(3).

## Discussion

In order to be entitled to SSI and DIB, a plaintiff must show that her inability to work is medical in nature. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966.

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point,

other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps one through four. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show that the plaintiff has the ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); *Imani v. Heckler*, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988 (1986).

In her appeal, Dick raises three claims: (1) that the ALJ erred in discounting treating and testimonial evidence, and instead made his own independent medical findings; (3) that the ALJ erred by failing to follow the order of the Appeals Council; and (3) that the ALJ erred in making contradictory findings about the medical existence of Dick's impairments. Each of these arguments will be addressed in turn.

10

1. **The ALJ erred in discounting treating and testimonial evidence**

Dick alleges that she has suffered from severe daytime sleepiness, dating back to 1998. Dr. Rasmus diagnosed Dick with idiopathic hypersomnia, and has treated her for this affliction since February, 2004. Dr. Manfredi testified that there had been an extensive work-up related to Dick's hypersomnia and that the evidence supporting Dick's diagnosis of idiopathic hypersomnia included an abnormal EEG test and an abnormal sleep latency test. Dr. Manfredi noted that the Neurology Consultants in Davenport, IA, continue to treat Dick and "have been convincing evidence that this is present and continues to interfere with the patient's normal functioning."

As treating specialist, Dr. Rasmus' opinions are entitled to controlling weight, if supported by the Record. 20 C.F.R § 404.1527(d), 416.927(d). The Court finds that the current Record supports Dr. Rasmus' opinions: Dr. Manfredi's testifmony, the EEG test, and an abnormal sleep latency test all support the diagnosis of idiopathic hypersomnia. Therefore, Dr. Rasmus' opinions should have been entitled to controlling weight.

Despite the medical evidence and testimony before the ALJ, ALJ Gildea denied Dick's disability application. ALJ Gildea found that Dick's idiopathic hypersomnia was not supported by objective evidence and held that Dr. Manfredi's testimony was not persuasive because he had never treated anyone suffering from this condition. ALJ Gildea concluded that Dick could perform all work-related activities except that she could not work in concentrated exposure to hazards, or do work using power tools or motor vehicles. Based on this RFC, ALJ Gildea found that Dick could perform her past work, thus she was not disabled.

The Court finds that the ALJ's conclusions are not supported by substantial evidence-- the evidence before the ALJ support the opposite conclusion. Further, the

Court finds that ALJ Gildea erred in discounting the treating and testimonial evidence. The ALJ discounted Dr. Manfredi's testimony because he had never treated someone suffering from idiopathic hypersomnia, even though his testimony did not refute Dr. Rasmus' diagnosis and ALJ Gildea did not have another neurologist testify at the hearing. The Court finds that a remand is necessary in order for the ALJ to hear testimony from a neurologist (with experience treating idiopathic hypersomnia) to clarify the nature, severity, and functional limitations resulting from Dick's impairments. Upon remand, the ALJ is directed to make a finding of RFC that is based on the testimony and medical evidence before him.

**2.    The ALJ erred by failing to follow the order of the Appeals Council**

On remand, the Appeals Council directed the ALJ to "[o]btain evidence from a neurologist to clarify the nature, severity and functional limitations resulting from the claimants impairments." Upon this direction, ALJ Gildea had Dr. Manfredi testify at the remand hearing. However, ALJ Gildea found that, because he had no experience in dealing with idiopathic hypersomnia, his opinion did not substitute for the standard "degree of medical probability" that would provide a basis for finding the claimant disabled.

While it is true that it is the claimant's burden to produce evidence of her disability, the Court finds that Dick met her initial burden: Dr. Rasmus diagnosed and treats Dick for idiopathic hypersomnia, and an abnormal EEG test, an abnormal sleep latency test, and Dr. Manfredi's testimony all support this diagnosis. When the Appeals Council ordered a remand, it did not appear to refute that Dick suffered from idiopathic hypersomnia; it merely wanted to determine the severity of impairments.

If the ALJ was not satisfied with Dr. Manfredi, the Court finds he erred in failing to have a second neurologist testify to explain the nature, severity and functional limitations of Dick's limitations. The Appeals Council specifically directed the ALJ to obtain this testimony from a neurologist and the ALJ acknowledged this directive at the hearing and in his decision. However, despite being aware of the instruction from the Appeals Council, the Court finds that the ALJ failed to follow this order. The Court finds that a remand is necessary in order for the ALJ to hear testimony from a neurologist (with experience treating idiopathic hypersomnia) to clarify the nature, severity, and functional limitations resulting from Dick's impairments, per the order from the Appeals Council.

**3.    Whether the ALJ erred in making contradictory findings about the medical existence of Dick's impairments**

ALJ Gildea found that Dick's idiopathic hypersomnia was established by the record and was a severe impairment. (R536). However, in his decision, ALJ Gildea stated that "although the claimant has an underlying medically determinable impairment that could reasonably cause the symptoms alleged, the medical evidence does not support these symptoms to the degree alleged by the claimant." (R538). Despite his original decision being vacated by the Appeals Council, ALJ Gildea found the identical RFC upon remand.

If Dick's sleep idiopathic hypersomnia is severe, it must therefore impose significant limitations on her ability to perform basic work functions. 20 C.F.R. §§ 404.1521, 416.921 (An impairment or combination of impairments is <u>not severe</u> if it does not significantly limit your physical or mental ability to do basic work activities.)

Therefore, upon remand, the Court directs the ALJ to better articulate how Dick's idiopathic hypersomnia can be severe, yet impose no functional limitations.

## CONCLUSION

For the reasons set forth above, Dick's Motion for Summary Judgment [#12] is GRANTED, and the Commissioner's Motion to Affirm [#14] is DENIED.  The matter is remanded to the ALJ, pursuant to sentence four of 42 U.S.C. § 405(g), to "[o]btain evidence from a neurologist to clarify the nature, severity and functional limitations resulting from the claimants impairments," pursuant to the Order of the Appeals Council.

ENTERED this 22nd of January, 2009.

/s Michael M. Mihm
Michael M. Mihm
United States District Judge